**[ECF No. 137]**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **CELLCO PARTNERSHIP, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE COUNTY OF MONMOUTH, NEW JERSEY, et al.,**<br><br>**Defendants.** | **Case No. 23-18091 (ESK/EAP)** |

**OPINION**

This matter comes before the Court on the Motion by Intervenor Defendants Belmar Against 5G Towers, Lawrence Reynolds, Rose Daganya, Michael Ushak, Dan Rubinetti, Paul M. Elia, and Michael and Mary McHale (collectively, "Intervenors") to exclude the reports and testimony of Plaintiffs' expert, Richard Conroy, and to sanction Plaintiffs Cellco Partnership (d/b/a Verizon Wireless) and New York SMSA Limited Partnership (collectively, "Plaintiffs") for spoliation and violations of Federal Rule of Civil Procedure 26. ECF No. 137 (Intervenors' Mot.). Plaintiffs have opposed the Motion, ECF No. 141 (Pls.' Opp.), and Intervenors have filed a reply brief, ECF No. 146 (Intervenors' Reply). The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1. For the following reasons, Intervenors' Motion is **DENIED**.

**BACKGROUND**

**I. Relevant Procedural History**

On September 7, 2023, Plaintiffs filed this action under the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332, against Defendants the County of Monmouth, New Jersey, the

Monmouth County Board of Commissioners, and five Monmouth County officials acting for and on behalf of Monmouth County (collectively, "Defendants"). ECF No. 1 ("Compl."). The suit challenges Defendants' denial of Plaintiffs' application to install nine Small Wireless Facilities ("SWFs")[1] in a public right-of-way in Belmar, New Jersey, a municipality in Monmouth County. *Id.* ¶¶ 48-82. In their current Third Amended and Supplemental Complaint, filed on June 16, 2025, Plaintiffs allege that Defendants violated the TCA by (a) failing to support the denial of Verizon's SWF application with substantial evidence; (b) materially inhibiting Verizon's provision of personal wireless service; (c) illegally regulating the placement, construction, and modification of personal wireless facilities on the basis of the environmental effects of radiofrequency ("RF") emissions; and (d) adopting a new small wireless facility ordinance that is preempted by federal law. ECF No. 120 ("Third Am. Compl.") at 1. In addition, Plaintiffs allege that Defendants breached their contract with respect to Verizon's proposed deployment of telecommunications facilities in the County's public rights-of-way. *Id.*

On September 27, 2023, three weeks after Verizon initiated suit, Intervenors filed a motion to intervene. ECF No. 12 (Mot. to Intervene). That motion described the Intervenors as "individuals who live and own property in the immediate vicinity of the [proposed SWFs] and will be directly and adversely affected if [they are] constructed and go[] into operation." ECF No. 12-1 (Proposed Intervenors' Br.) at 2. On March 7, 2024, the Court found that Intervenors met the standard for permissive intervention under Federal Rule of Civil Procedure 24(b). ECF No. 52 (Mem. Order).

On February 4, 2026, in connection with the dispositive motion deadline, Intervenors filed the current Motion to Preclude the Reports and Testimony of Plaintiffs' Expert Richard Conroy. *See* Intervenors' Mot. Plaintiffs filed their opposition on February 27, 2026, *see* Pls.' Opp., and

[1] The Complaint defines SWFs as devices that "assist in providing wireless telecommunications and broadband services to its customers." *Id.* ¶ 40.

Intervenors submitted a reply brief on March 13, 2026, *see* Intervenors' Reply. The issues raised are now ripe for disposition.

## II. Facts Pertinent to the Motion to Preclude

### A. Fact Discovery

On February 9, 2024—prior to Intervenors' entry into the case—Defendants served their First Set of Requests for Production ("RFPs") on Plaintiffs requesting "[a]ny and all documents that evidence, support, reflect, refer, and/or relate to Plaintiffs' analysis and determination that 'Verizon's wireless network has exceeded its capacity to handle the demand for wireless services in Belmar,' including raw drive test data and records of dropped calls and/or denial of service for the area Plaintiffs propose to serve in this Action." ECF No. 141-1 (Declaration of Jonathan Kaufman ("Kaufman Decl.")), Ex. 1 (Defs.' RFPs) at RFP No. 4.

Plaintiffs served their written responses and objections on June 7, 2024. Kaufman Decl., Ex. 2 (Pls.' Resp. to RFPs). In response to RFP No. 4, Plaintiffs objected, among other things, that the request sought "premature expert disclosures." *Id.* at RFP No. 4. They nonetheless produced existing responsive documents within their possession, custody, and control. *Id.*

Four months later, on October 8, 2024, Defendants filed a discovery dispute letter noting that in response to Defendants' discovery requests, "Plaintiffs specifically failed to produce any raw drive test data or records of dropped calls and/or denial of service for the area Plaintiffs propose to serve. Instead, Plaintiffs responses to these interrogatories and requests for production cite to two—and only two—conclusory documents that provide vague statements regarding service in the Belmar area, unsupported by any data, or at the very least any data which has been produced to Defendants . . . ." ECF No. 87 (Defs.' Oct. 8, 2024 Ltr.). During a discovery conference, the Court addressed this dispute and ordered (1) Plaintiffs' counsel to confer with their clients to determine the availability of dropped call records and blocked call/access failure rate records for the past eighteen

months for the location at issue; (2) the parties to confer regarding Plaintiffs' production of those dropped call/access failure rate records; and (3) the parties to meet and confer regarding when Plaintiffs' expert would generate and produce the data relied upon in his expert report. ECF No. 92 (Oct. 11, 2024 Order).

Pursuant to this Order, Plaintiffs' counsel conferred with their clients and their expert Richard Conroy. Kaufman Decl. ¶ 5. In addition, counsel for all parties held a meet-and-confer on October 31, 2024, during which Plaintiffs agreed to produce spreadsheets containing key performance indicator ("KPI") data[2] upon which Conroy would base his expert report, and Defendants' counsel clarified that Defendants sought certain line-item details regarding dropped/blocked calls (e.g., phone numbers) and the total numbers of dropped/blocked calls and successful calls. *Id.* ¶ 6 & Ex. 3 (Email re: Meet-and-Confer). Thereafter, on November 20, 2024, Plaintiffs produced a download link for two "voluminous" spreadsheets containing the agreed-upon KPI data. *Id.* ¶ 8 & Ex. 4 (Email re: RF Data Production). Plaintiffs then supplemented their production on May 8, 2025, with two additional spreadsheets providing the agreed-upon KPI data for one additional existing site that Conroy had then recently identified as a serving site for the area that would be covered by one of the proposed SWFs. *Id.* ¶ 8.

On December 2, 2024, in advance of the Court's December 5, 2024 conference, Plaintiffs filed a letter advising as to the status of discovery and seeking an extension of case management deadlines. ECF No. 95 (Pls.' Dec. 2, 2024 Ltr.). On the same date, Defendants filed their own letter noting that Plaintiffs had produced "two lengthy spreadsheets" that purported to provide the requested information regarding numbers of dropped, blocked/access failure, and successfully

[2] Plaintiffs' senior RF engineer, Osama Eldsoky, testified that "KPIs is data from what sites do, what each carrier does, how many users are on the sites, how many connections are connected, data volume . . ." Kaufman Decl., Ex. 5 (Dep. of Osama Eldsoky ("Eldsoky Dep.")) at 8:23-25.

completed calls during an eighteen-month time period at the location where Plaintiffs sought to install the nine SWFs at issue in this action. ECF No. 96 (Defs.' Dec. 2, 2024 Ltr.) at 1-2. Defendants indicated that they were "in the process of reviewing these technical spreadsheets to evaluate whether they provide the agreed upon information, assessing whether the assistance of a consulting expert is needed to interpret the data in these spreadsheets, and whether the data substantiate Plaintiffs' allegations to the effect that a lack of capacity truly exists." *Id.* at 2. Notably, Intervenors did not file a discovery dispute letter in advance of this conference. *See generally* Dkt. Indeed, as Plaintiffs note, Intervenors filed no status letters advising of any discovery disputes in advance of any status conferences in this action. Kaufman Decl. ¶ 12; *see generally* Dkt.

On February 25, 2025, Defendants and Intervenors deposed Plaintiffs' senior RF engineer, Osama Eldsoky, who testified extensively about the KPI data. Kaufman Decl. ¶ 13 & Ex. 5 (Eldsoky Dep.). Fact discovery then closed on March 3, 2025, as to Plaintiffs' First Amended and Supplemental Complaint, *id.* ¶ 14 (citing ECF No. 106 (Feb. 4, 2025 Am. Scheduling Order) ¶ 4), and on May 20, 2025, as to "'the additional issues/allegations raised in the Second Amended and Supplemental Complaint,'" *id.* ¶ 15 (quoting ECF No. 109 (Mar. 20, 2025 Stip. & Consent Order) ¶ 3; citing ECF No. 116 (Apr. 30, 2025 Order)). Prior to the closing dates for fact discovery, Intervenors neither raised issues pertaining to the KPI data nor requested the production of any KPI data. Kaufman Decl. ¶¶ 16-17.

B. <u>Conroy's Expert Reports and Deposition</u>

On July 5, 2024, Plaintiffs retained Richard Conroy to perform expert work on their behalf. ECF No. 137-2 (Declaration of Joseph M. Carusone, Esq. ("Carusone Decl.")), Ex. E (Dep. of Richard Conroy ("Conroy Dep.")) at 16:21-24. On June 20, 2025, Conroy published his expert report, in which he sought to "explain and demonstrate Verizon's significant gap in service in and around the areas of the Small Cell Nodes (the 'Service Gap') and the need for the Small Cell Nodes

to provide the necessary densification of Verizon's network (i.e., increase network capacity) required to provide reliable personal wireless services and telecommunications services within the Service Gap." Carusone Decl., Ex. A (Rep. of Richard Conroy ("Conroy Rep.")) ¶ 3. Conroy stated that he "utilized best server maps and key performance indicators ('KPIs') to scientifically and reliably demonstrate Verizon's significant Service Gap in accordance with accepted industry methodology and standards." *Id.* On July 21, 2025, Intervenors' expert, Robert L. Beegle III, authored his rebuttal report. Carusone Decl., Ex. G (Rep. of Robert L. Beegle III ("Beegle Rep.")). On August 18, 2025, Conroy published a reply report. Carusone Decl., Ex. B (Reply Rep. of Richard Conroy ("Conroy Reply")).

In his initial report, Conroy relies on KPIs to opine that "the existing macrocell coverage cannot sustain acceptable service levels, especially when usage surges during the peak summer demand." Conroy Rep. ¶ 72. He describes KPIs as "measurable metrics used by wireless carriers like Verizon to evaluate the performance, reliability, and efficiency of their networks across FCC-licensed frequency bands and technologies," including "call drop rate, data throughput, latency, signal strength (RSRP), and network availability[.]" *Id.* ¶ 32. According to Conroy, "[t]he KPIs serve as a source of technical data for engineers to determine the operation of the network and where network densification may be required." *Id.* ¶ 36. Conroy represents that "KPI data was collected for the three macro sites providing a best serving signal to the Service Gap area" and was based upon "the daily hourly data between the hours of 6AM and 8PM—when usage is typically at its highest." *Id.* ¶ 37.

On August 21, 2025, Intervenors noticed Conroy's deposition and requested that he produce, among other things, "[t]he data or other information reviewed, considered, relied on, and/or used by YOU in preparing and forming YOUR opinions in YOUR EXPERT REPORT, including but not limited to . . . the original data as it existed prior to export to the Excel spreadsheets . . . ." Kaufman

Decl. ¶ 18 & Ex. 6 (Dep. Notice) at RPD No. 2. Plaintiffs objected to the request on the ground that they would have to respond in less than the thirty days provided for by Federal Rule of Civil Procedure 34(b)(2)(A). Kaufman Decl., Ex. 7 (Pls.' Resp. to Intervenors' RPDs), General Objection No. 2. In addition, Plaintiffs stated specific objections to this request:

> Verizon objects to this Request on the ground that the terms "original cell tower recordings" and "original source data" are vague and ambiguous. Verizon also objects to this Request to the extent that its [sic] requests data in a format that does not exist . . . . Notwithstanding the General Objections and specific objections to this Request, and subject thereto, Verizon refers Intervenors to: (1) the Expert Report of Richard Conroy dated June 20, 2025, including the exhibits attached thereto and to the documents cited therein that were previously produced in this action; (2) the Reply Expert Report of Richard Conroy dated August 18, 2025, including the exhibits attached thereto and to the documents cited therein that were previously produced in this action; and (3) the TAB files (and related files) that may be opened with GIS software to view Mr. Conroy's best server maps and a cross-reference sheet for ease of identification, that Verizon previously provided for Mr. Beegle's consideration at the request of Intervenors . . . . Verizon also now produces certain of the documents identified on page 38 of the Conroy Report that were not previously produced in this action . . . .

*Id.*; Pls.' Resp. to Intervenors' RPD No. 2.

When Intervenors sent a deficiency notice about the above response, Plaintiffs followed up via email, explaining that "Verizon produced the spreadsheets on November 20, 2024 and Intervenors/Defendants took Mr. Eldsoky's deposition [Plaintiffs' Rule 30(b)(6) witness] on February 25, 2025; however, Intervenors failed to raise this issue until 6 months later and well-after the close of fact discovery." Kaufman Decl., Ex. 8 (Sept. 8, 2025 Email from Kaufman). Additionally, Plaintiffs remarked that "as we have previously stated, the raw data was provided in the spreadsheets that were produced during fact discovery. There is no other digital footprint for or any manner in which to view what you refer to as the 'original cell tower recordings' and 'original source data[.]'" *Id.*

During Conroy's ensuing September 9, 2025 deposition, Intervenors objected that Verizon and the witness "failed to provide all the documents demanded by us in discovery and our request for documents" and reserved the right to recall Conroy to the extent that any of the requested information was provided. Carusone Decl., Ex. E, Conroy Dep. at 121:14-22. Intervenors' counsel then expanded on the scope of those additional documents, noting that

> we still do not know, you haven't told us, whether the original data that was used to generate the spreadsheets that were exported from Verizon's system into the CSV files that are now the spreadsheets we don't know if that original data exists. We've never got an answer on that. We have a hint in the witness' testimony that perhaps it no longer exists because of a potential six-month policy that Verizon has . . . .

*Id.* at 204:19-205:5. When Plaintiffs' counsel indicated that the data was produced by way of spreadsheets back in November, Intervenors' counsel reiterated his request for the original data "to be able to verify the values in the spreadsheet[.]" *Id.* at 205:7-25. Plaintiffs' counsel responded that Intervenors should put any additional demands in writing and Plaintiffs would take them under advisement. *Id.* at 206:1-207:7.

According to Plaintiffs, however, prior to the close of expert discovery, Intervenors never made any follow-up demands or raised any issues to the Court with respect to the KPI data, nor did Intervenors advise Plaintiffs or the Court that they intended to challenge the KPI data or seek to exclude Conroy's expert report and testimony. Kaufman Decl. ¶¶ 23-24. Indeed, in the October 28, 2025 joint status letter, the parties advised only that expert depositions had been completed and that expert discovery should be completed by November 10, 2025. ECF No. 125 (Oct. 28, 2025 Joint Ltr.) at 1. The parties further represented that they intended to engage in dispositive motion practice and jointly requested that the November 17, 2025 status conference with the Court be adjourned. *Id.* at 1-2.

C. <u>The Discovery at Issue</u>

The dispute at issue focuses on the Raw KPI Source Data. Raw KPI Source Data from individual user devices is collected and stored at the eNodeBs ("Nodes"). The Nodes are the base stations on Verizon's user network that communicate with the user equipment. They gather the data, temporarily store it, and then transmit it to some centralized location in Verizon's network. Conroy Dep. at 66:5-67:3. Once the data goes into Verizon's systems, an engineer can pull it from a specific Node for a desired period and review that information. *Id.* at 67:6-12. Additionally, the engineer can select certain parameters to further analyze the data and export it to a CSV (or spreadsheet) file. *Id.* at 67:13-17.

Conroy explained that raw data is extracted from the Node using Verizon's extraction software tool, and the numbers that appear in the spreadsheet represent the raw data from the Nodes. *Id.* at 91:19-92:3. He further testified that the values in the spreadsheet are the raw data that comes in CSV format, and wireless carriers rely on that raw data to assess the performance of their networks and ensure they are operating properly. *Id.* at 93:2-94:16. When asked how to "validate the provenance of the value of the numeric character that appears in that cell[]" on the spreadsheet, Conroy simply replied that the spreadsheets are "very reliable." *Id.* at 93:11-94:16.

In his expert report, Conroy examined the KPI data, expressed in spreadsheets, from three sites within the Verizon network. Conroy Rep. ¶ 37. The Lake Como and Belmar2 KPI data is based on a data collection period of 390 days from October 23, 2023, through November 15, 2024. *Id.* The Neptune City site was analyzed using two datasets, one consisting of 245 days from January 29, 2024, through September 30, 2024, and a second dataset consisting of 145 days from May 4, 2024, through September 30, 2024. *Id.* ¶ 38. Conroy indicated that "Verizon's systems . . . store busy hour data for only six (6) months." *Id.* ¶ 38 n.11. All of these spreadsheets were generated in November 2024 and then provided to Conroy for analysis. Conroy Dep. at 71:9-15. Conroy testified

that he did not give any directions on what information should be included within the spreadsheets. *Id.* at 71:15-17.

**DISCUSSION**

Intervenors now seek to exclude Conroy's report from use in dispositive motions or at trial. First, they contend that because Plaintiffs spoliated the Raw KPI Source Data on which Conroy based his expert report, the Court should preclude his reports and testimony pursuant to Federal Rule of Civil Procedure 37. Intervenors' Mot. at 12-19. Second, they argue that Plaintiffs failed to comply with Federal Rule of Civil Procedure 26's requirement that an expert report be accompanied by the facts or data considered by the witness in forming his opinion. *Id.* at 19-21 (citing Fed. R. Civ. P. 26(a)(2)(B)(ii)). According to Intervenors, the absence of those "facts or data"—here, the Raw KPI Source Data—constitutes a material omission rendering Conroy's Report deficient and therefore excludable. *Id.* Finally, Intervenors claim that under Federal Rule of Evidence 703, Plaintiffs have not established that Conroy's reliance on hearsay, i.e., the Verizon-generated spreadsheets, is reliable. *Id.* at 22-27.

Plaintiffs raise multiple challenges to the Intervenors' Motion. Primarily, they assert that the Motion is, in substance, an untimely discovery motion that should be denied. Pls.' Opp. at 9-10. Next, Plaintiffs argue that Intervenors have failed to demonstrate that any evidence was spoliated or that Plaintiffs failed to take reasonable steps to preserve the raw data. *Id.* at 11-15. Alternatively, Plaintiffs argue that even if the Court found spoliation, Intervenors' Motion should be denied because they have not suffered prejudice. *Id.* at 16-19. Plaintiffs further contend that they fully complied with their obligations under Federal Rule of Civil Procedure 26(a)(2)(B). *Id.* at 19-20. Finally, Plaintiffs argue that the data on which Conroy relied falls within the business records exception to the hearsay rule, and in any event, is admissible under Federal Rule of Evidence 703 as the type of evidence reasonably relied upon by experts in the field. *Id.* at 20-32.

The Court separately addresses each of the parties' arguments.

## I. **Whether Intervenors' Motion Should Be Denied as an Untimely Discovery Motion**

Plaintiffs first argue that the Intervenors' Motion constitutes an untimely discovery motion to compel documents that they never previously sought during fact discovery. *Id.* at 9-10. Accordingly, they assert that Intervenors waived the right to challenge the non-production of the Raw KPI Source Data. *Id.*

Federal Rule of Civil Procedure 16 provides that "a court shall enter scheduling orders to allow for 'judicial control over a case and to schedule dates for completion by the parties of the principal pretrial steps.'" *Stillman v. Staples, Inc.*, No. 07-849, 2009 WL 1437817, at *6 (D.N.J. May 15, 2009) (quoting *Harrison Beverage Co. v. Dribeck Imps., Inc.*, 133 F.R.D. 463, 469 (D.N.J. 1990) (quotations omitted)). The purpose of Rule 16 is to streamline the preparation and presentation of cases. *Newton v. A.C. & S., Inc.*, 918 F.2d 1121, 1126 (3d Cir. 1990).

The time within which to file a motion to compel for discovery deficiencies is not specified by the Federal Rules of Civil Procedure, but "courts have made it clear that a party seeking to compel discovery must do so in timely fashion." *EQT Prod. Co. v. Terra Servs., LLC*, No. 14-1053, 2018 WL 4300554, at *2 (W.D. Pa. Aug. 13, 2018) (citation omitted). "District courts have repeatedly recognized that '[m]otions to compel filed within days of the close of discovery are untimely.'" *U.S. ex rel. Gohil v. Sanofi U.S. Servs., Inc.*, No. 02-2964, 2020 WL 1888966, at *4 (E.D. Pa. Apr. 16, 2020) (quoting *Cont'l Cas. Co. v. Tyson Foods, Inc.*, No. 15-20, 2017 WL 11180629, at *2 (E.D. Tenn. June 15, 2017) (collecting cases)); *see also Santiago v. N.Y. & N.J. Port Auth.*, No. 11-4254, 2015 WL 1107344, at *2 (D.N.J. Mar. 11, 2015) ("[A] party must file a motion to compel discovery *with the Court* prior to the close of the discovery period or the request is untimely." (emphasis in original)); *Days Inn Worldwide, Inc. v. Sonia Invs.*, 237 F.R.D. 395, 396-97 (N.D. Tex. 2006) (citing cases holding that motions to compel filed after the close of discovery are untimely).

The timely filing and subsequent grant of a motion to compel constitutes a prerequisite to a party's request for discovery sanctions under Federal Rule of Civil Procedure 37. *See McMullen v. Bay Ship Mgmt.*, 335 F.3d 215, 217 (3d Cir. 2003) ("Generally [Rule 37] requires the issuance of an order to compel and only after failure to comply with that order should a penalty be imposed."); *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995) ("In order to succeed on a motion to compel discovery, a party must first prove that it sought discovery from its opponent."); *Mutschler v. Tritt*, No. 14-2477, 2016 WL 6496444, at *2 (M.D. Pa. Nov. 1, 2016) ("Federal Rule of Civil Procedure 37 provides that if a party fails to obey *an order* to provide discovery the court may fashion appropriate sanctions." (emphasis added)); *see also* 8B Wright & Miller's *Federal Practice & Procedure* § 2282 (3d ed. Apr. 2026 Update) ("When the discovery procedure is initially set in motion by the parties themselves without a court order, the party seeking discovery must first obtain an order under Rule 37(a) requiring the recalcitrant party or witness to make the discovery sought; *it is only a violation of this order that is punishable under Rule 37(b)*." (emphasis added)). Where parties have failed to raise concerns about withholding or destroying evidence during the discovery phase—either through a court conference, a motion to compel, or a motion for sanctions—courts have viewed with suspicion subsequent sanctions motions raised during summary judgment proceedings. *See, e.g., Glenn v. Scott Paper Co.*, No. 92-1873, 1993 WL 431161, at *30 n.3 (D.N.J. Oct. 20, 1993) (where, during summary judgment proceedings, the plaintiff accused the defendant of withholding and destroying evidence, the court noted that plaintiff had never previously raised these concerns during the discovery phase and found it "too late in the day" for such discovery issues to be raised); *Karpf v. Mass. Mut. Life Ins. Co.*, No. 10-1401, 2019 WL 507167, at *5 (E.D. Pa. Feb. 7, 2019) (noting that the failure to pursue a discovery remedy in timely fashion may constitute a waiver of the discovery violation (quotation omitted)).

Here, Intervenors' Motion constitutes an untimely motion to compel and signals an improper strategic maneuver to eliminate Plaintiffs' key expert. As set forth above, during fact discovery, it was Defendants—not Intervenors—that requested the data reflecting Verizon's determination that its network exceeded its capacity to handle the demand for wireless services in the relevant area, including the Raw KPI Source Data. *See* Kaufman Decl., Ex. 1, RFP No. 4. Following receipt of Plaintiffs' responses, Defendants—not Intervenors—filed a discovery dispute letter indicating that they were still lacking the Raw KPI Source Data. ECF No. 87. The Court addressed this issue at a conference and directed Plaintiffs' counsel to determine the availability of this information and ascertain when Plaintiffs' expert would generate and produce the data relied upon in his expert report. ECF No. 92. During the ensuing meet-and-confer, counsel for Plaintiffs and Defendants reached a compromise: Plaintiffs would produce the spreadsheets containing the KPI data upon which Conroy would base his expert report. Kaufman Decl. ¶¶ 5-6. On November 20, 2024, Plaintiffs provided a download link for two "voluminous" spreadsheets containing the agreed-upon KPI data, with a supplementation on May 8, 2025. *Id.* ¶ 8 & Ex. 4. In advance of the Court's December 5, 2024 status conference, Defendants indicated that they were reviewing whether the spreadsheets supplied the needed information. ECF No. 96 at 1-2. Defendants raised no subsequent complaint about the sufficiency of that production.

In compliance with the Court's Scheduling Order, Conroy then published his expert report on June 20, 2025. Kaufman Decl. ¶ 25. Yet, it was not until August 21, 2025—when Intervenors noticed Conroy's deposition—that Intervenors made their first request for "the original data as it existed prior to export to the Excel spreadsheets." Kaufman Decl. ¶ 18 & Ex. 6. In both their response to the discovery request and a subsequent email, Plaintiffs explained that (1) there was no other digital footprint or any manner in which to view the original source data other than the spreadsheets; and (2) they had produced both the spreadsheets on November 20, 2024, and their

senior engineer for a Rule 30(b)(6) deposition in February 2025, but Intervenors failed to raise any concern with the spreadsheets until six months later. Kaufman Decl., Ex. 7, Pls.' Resp. to RPD No. 2; Kaufman Decl., Ex. 8.

During Conroy's September 9, 2025 deposition, Intervenors again raised a general objection that Plaintiffs "have failed to provide all the documents demanded by us in discovery and our request for documents." Conroy Dep. at 121:14-22. After the deposition, however, Intervenors never made any follow-up demands to Plaintiffs or alerted the Court to any issue regarding the Raw KPI Source Data, despite the fact that the Court continued to schedule and conduct status conferences. Kaufman Decl. ¶¶ 23-24; ECF No. 125. Indeed, Intervenors waited almost five more months before filing the present motion seeking to preclude Conroy's reports and testimony in their entirety. *See* Intervenors' Mot.

The Court rejects such gamesmanship. Notwithstanding the firmly established principle that a party seeking discovery sanctions under Federal Rule of Civil Procedure 37 must identify a court order that was violated, *see McMullen*, 335 F.3d at 217, Intervenors identify no such order. Indeed, during the entire course of fact discovery, Intervenors remained silent, seemingly content to permit Defendants to take the lead on obtaining the Raw KPI Source Data from Plaintiffs. When Plaintiffs and Defendants reached an agreement in November 2024 to use the KPI spreadsheets at issue, Intervenors again said nothing. Only nine months later—just prior to Conroy's deposition—did Intervenors attempt to obtain the Raw KPI Source Data, despite implicitly indicating their satisfaction with the spreadsheets produced during fact discovery. Following Conroy's deposition, Intervenors chose to exploit this issue for tactical advantage rather than alert the Court to the potential dispute, seeking wholesale exclusion of the expert at the core of Plaintiffs' case. Notably, Defendants have not joined in these efforts. Having elected not to move for a Court order

compelling production of the Raw KPI Source Data, Intervenors are not entitled to the drastic sanction they now seek.[3]

In short, the Court finds that Intervenors' present Motion constitutes a belated attempt to raise a discovery failure and simultaneously seek sanctions for that failure. As such, Intervenors' Motion is denied on that procedural basis.

## II. Whether Intervenors' Motion Has Substantive Merit

Notwithstanding the procedurally improper nature of Intervenors' Motion, Intervenors argue that they have a substantive basis for relief. Specifically, Intervenors assert that Conroy's report must be excluded on any of three grounds: (1) Plaintiffs have improperly spoliated the evidence on which Conroy based his expert report, Intervenors' Mot. at 12-19; (2) Plaintiffs failed to comply with Federal Rule of Civil Procedure 26's requirement that an expert report be accompanied by the facts or data considered by the witness in forming his opinion, *id.* at 19-21; and (3) under Federal Rule of Evidence 703, Conroy cannot rely on the Verizon-generated spreadsheets, which are hearsay, *id.* at 22-27. The Court finds no merit to any of these arguments.

### A. Whether Plaintiffs' Alleged Spoliation of Evidence Warrants Exclusion of Conroy's Reports and Testimony

Intervenors first contend that Plaintiffs engaged in spoliation of vital electronically stored information ("ESI") because they "did not maintain the Raw KPI Source Data which is central to Conroy's conclusions, despite existing pending litigation and prior discovery requests specifically calling for it." *Id.* at 13. And because Plaintiffs have yet to produce that data, Intervenors speculate

[3] The Intervenors' reply brief confirms the Court's suspicions that this Motion is a tactical maneuver rather than a genuine attempt to obtain the Raw KPI Source Data. Intervenors argue that they "do not seek to reopen discovery or have Verizon produce the Raw KPI Source Data. The Motion calls for the exclusion of Conroy's Reports and testimony[.]" Intervenors' Reply at 4.

that it must no longer exist. *Id.* at 15. In turn, they claim that the "most equitable remedy" is the exclusion of Conroy's reports and testimony. *Id.*

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably for[e]seeable litigation." *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (internal quotations omitted). A court may impose sanctions if evidence shows that spoliation occurred. *Id.* The moving party must initially prove that the spoliated evidence exists or existed prior to the alleged spoliation. *See Omogbehin v. Cino*, 485 F. App'x 606, 610 (3d Cir. 2012). Courts then conduct a two-step inquiry to determine whether sanctions for spoliation of evidence are appropriate. *Lucia v. McClain & Co., Inc.*, No. 11-930, 2013 WL 4517976, at *8 (D.N.J. Aug. 23, 2013). First, the Court asks whether the conduct at issue constitutes spoliation. *Id.* Second, the Court considers what sanctions are available. *Id.* (citing *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 n.5 (3d Cir. 2012)).

Applying these standards here, the Court finds no basis for Intervenors' requested relief.

*1. Whether Intervenors Have Established That Spoliation Occurred*

Under the first step of the inquiry, where the alleged spoliation involves ESI, courts in the Third Circuit apply the standards set forth in Federal Rule of Civil Procedure 37(e). *See Orbay v. Harrah's Atl. City Operating Co., LLC*, No. 22-935, 2025 WL 1343094, at *2 (D.N.J. Apr. 11, 2025) (noting that "'it appears that Rule 37(e) exclusively governs the spoliation inquiry'") (quoting *Bistrian v. Levi*, 448 F. Supp. 3d 454, 465 n.14 (E.D. Pa. 2020)). Under Rule 37(e), to establish spoliation

> [T]he moving party must show that: (i) certain ESI should have been preserved in anticipation or conduct of litigation; (ii) the ESI was lost; (iii) the ESI was lost because the party against which sanctions are sought failed to take reasonable steps to preserve it; and (iv) the ESI cannot be restored or replaced.

*Orbay*, 2025 WL 1343094, at *2 (quoting *Profit Point Tax Techs., Inc. v. DPAD Grp.*, No. 19-698, 2023 WL 11968310, at *2 (W.D. Pa. Apr. 26, 2023)).

Intervenors posit that when Plaintiffs initiated this litigation on September 7, 2023, they knew that evidence of wireless coverage or performance would be critical to their claims. Intervenors' Mot. at 13. As such, Plaintiffs retained Conroy to author a report examining the KPI data. *Id.* at 14. Although Plaintiffs provided Conroy with spreadsheets summarizing KPI data pulled from the Raw KPI Source Data recorded at the Nodes, Intervenors contend that "[a]t a minimum, Verizon should have maintained the Raw KPI Source Data that formed the basis of the datasets at least until April of 2025, based on their internal policies." *Id.* More importantly, according to Intervenors, "Defendants and Intervenors specifically requested Verizon maintain the Raw KPI Source Data through discovery requests. Instead, Verizon did not retain a single scrap of Raw KPI Source Data and spoliated this salient evidence." *Id.* (emphasis omitted). Intervenors conclude that "the KPI Data summaries analyzed in Conroy's Report likely cannot be restored. Verizon deleted the Raw KPI Source Data from which they were created and has not indicated it is recoverable." *Id.* at 14-15.

Intervenors' spoliation argument, however, suffers from several crucial flaws. Primarily, Intervenors have not shown that the "raw data" that they seek is different from the numbers in the spreadsheets that Plaintiffs produced, such that spoliation occurred. Plaintiffs have submitted declarations from their engineers affirmatively stating that "[t]he data contained in the Spreadsheet is the raw data that Verizon collects in the normal course of business," and that "[t]he data and column headings contained in the Spreadsheet were in no way manipulated or translated by any person." ECF No. 141-18, Decl. of Ahmed Alagha ("Alagha Decl.") ¶¶ 8, 11; ECF No. 141-19, Decl. of Mahmoud Elbadawy ("Elbadawy Decl.") ¶¶ 8, 11; *see also* ECF No. 141-17, Decl. of Richard Conroy ("Conroy Decl.") ¶¶ 8-9 ("[A]s I testified, the 'values [in the cells] are the raw data'

that Verizon collects in the normal course of business, not a summary of such data, and the headers simply indicate what the values are measuring, they do not translate the data."). Indeed, as Conroy testified in his deposition, Plaintiffs use an extraction software tool to pull the raw data from the eNodeBs, and "that's what those numbers [in the spreadsheets] represent." Conroy Dep. at 91:21-92:2.

Moreover, production of the Raw KPI Source Data through the spreadsheets complies with Plaintiffs' discovery obligations. Federal Rule of Civil Procedure 34(a)(1) permits a party to request from another party information "stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form[.]" Fed. R. Civ. P. 34(a)(1)(A). Rule 34(b)(2)(E)(ii) goes on to provide that "[i]f a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms[.]" Fed. R. Civ. P. 34(b)(2)(E)(ii).

Here, the original RFP propounded by Defendants sought "all documents that evidence, support, reflect, refer, and/or relate to Plaintiffs' analysis and determination that 'Verizon's wireless network has exceeded its capacity to handle the demand for wireless services in Belmar,' including raw drive test data and records of dropped calls and/or denial of service for the area Plaintiffs propose to serve in this Action." Kaufman Decl., Ex. 2, RFP No. 4. The RFP did not specify a form of production. To that end, and in compliance with Rule 34, Plaintiffs produced the spreadsheets, which "are the only practical and useable means for preserving the data and are consistent with how Verizon uses and preserves the data in the ordinary course of business." Elbadawy Decl. ¶ 5; Alagha Decl. ¶ 5; ECF No. 141-20 (Decl. of Henry Kelch ("Kelch Decl.")) ¶ 5.

Finally, Intervenors have not established that Plaintiffs failed to take reasonable steps to preserve the raw data. Defendants—the parties that requested the raw data during discovery—

explicitly agreed to Plaintiffs' preservation of that data through the spreadsheets. Kaufman Decl. ¶¶ 2-8; *see also* Kaufman Decl., Ex. 8 (Sept. 8, 2025 email from Plaintiffs' counsel noting that "as we have previously stated, the raw data was provided in the spreadsheets that were produced during fact discovery. There is no other digital footprint for or any manner in which to view what you refer to as the 'original cell tower recordings' and 'original source data[.]'"). In the face of such evidence, Intervenors have not explained what production of the Raw KPI Source Data before "translation" or extraction into spreadsheets would look like—or how that data could even be obtained.[4] Mere speculation that such information must exist and differs from the data downloaded through the XLPT database[5] and put into spreadsheets does not establish spoliation.

*2. Whether Intervenors Have Established an Entitlement to Sanctions*

Even assuming spoliation of the Raw KPI Source Data, Intervenors' argument fails at the second step of the analysis—sanctions. Once a court concludes that spoliation has occurred, the court "may in its discretion issue sanctions[.]" *Manning v. Safelite Fulfillment, Inc.*, No. 17-2824, 2021 WL 3557582, at *7 (D.N.J. Apr. 29, 2021). Notably, the sanctions analysis remains separate from any analysis regarding whether spoliation occurred. *Omogbehin*, 485 F. App'x at 610.

To determine whether and what kind of sanctions should be imposed, a court must use the framework set forth in Federal Rule of Civil Procedure 37(e). *Bistrian*, 448 F. Supp. 3d at 466. Rule 37(e) states, in pertinent part:

---

[4] Intervenors argue that "[e]ven if the Raw KPI Source Data was unviewable in the form stored at the Nodes, Verizon should have produced it for ***Intervenors to translate***, because Intervenors are not required to rely on Verizon's translation, as it still served as the basis of some of the KPI Data from the Spreadsheets." Intervenors' Reply at 7 (emphasis in original). As set forth above, however, Plaintiffs use their proprietary software extraction tool to obtain the data from the Nodes, and that software puts the data into a spreadsheet. Intervenors have not explained how Plaintiffs could have provided the data to Intervenors for them to translate, nor have Intervenors indicated that they have a similar extraction software tool.

[5] Verizon stores the KPI data in the XLPT database. For additional detail, see *infra* n.11.

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

This Rule "gives courts authority to address a party's failure to preserve evidence, 'foreclos[ing] reliance on inherent authority or state law to determine when certain measures should be used.'" *Am. Inst. for Chartered Prop. Cas. Underwriters v. Posner*, No. 23-3251, 2025 WL 48332, at *3 n.12 (3d Cir. Jan. 8, 2025) (quoting Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment) (alteration in original). "[A] court may resort to (e)(1) measures only 'upon finding prejudice to another party from the loss of the information.'" Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (quoting Fed. R. Civ. P. 37(e)(1)). Absent a showing of prejudice, subdivision (e)(2) permits a moving party to obtain sanctions by proving that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The United States Court of Appeals for the Third Circuit has instructed courts to exercise discretion in imposing sanctions and to choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 84 (3d Cir. 2019) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994) (further quotations omitted)).

Here, Intervenors have not made the required showing under either Rule 37(e)(1) or Rule 37(e)(2). As to intent under Rule 37(e)(2), Intervenors have not suggested any bad faith on Plaintiffs' part. As to prejudice under Rule 37(e)(1), Intervenors have made no showing that the Raw KPI Source Data is somehow different from the information downloaded to the spreadsheets. Indeed, Intervenors' expert, Robert L. Beegle III, explicitly testified that he has no reason to believe that the data that was provided was inaccurate or that it could not be relied upon. Kaufman Decl., Ex. 13 (Dep. of Robert L. Beegle III ("Beegle Dep.")) at 38:10-18. Beegle went on to note that he "believe[d] the data is correct as far as the data is what the data is that Verizon provided. And I have no reason to believe that, you know, it's been changed in any way." *Id.* at 75:14-17; *see also id.* at 43:6-8, 156:1-9. Intervenors' speculative assertion that the raw data would allow for more effective cross-examination does not meet Intervenors' burden of proving prejudice.[6]

In short, the Court does not find that Intervenors have established either actual spoliation or an entitlement to spoliation sanctions. Accordingly, Intervenors' Motion is denied on this ground.

B. <u>Whether Plaintiffs' Alleged Failure to Comply with Federal Rule of Civil Procedure 26 Warrants Exclusion of Conroy's Reports and Testimony</u>

Intervenors next argue that the Conroy Report fails to comply with Federal Rule of Civil Procedure 26(a)(2). Intervenors' Mot. at 19-21. Rule 26(a)(2) provides that a witness who is "retained or specially employed to provide expert testimony" must produce a written report that contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming

[6] Intervenors also argue that absent the Raw KPI Source Data, they cannot discover if other potential KPIs, which were not extracted or analyzed in the Conroy Report, contradict Conroy's conclusions. Intervenors' Mot. at 17. During fact discovery, however, the Court only ordered Plaintiffs to produce dropped call records and blocked call/access failure rate records for the past eighteen months for the location where Plaintiffs seek to install the nine SWFs at issue in this action. *See* ECF No. 92, ¶ 3(b). Intervenors make no showing that either they or Defendants requested any of the "other potential KPIs" that they now seek.

them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). After disclosing an expert report, "a party . . . must supplement or correct its disclosure or response" if it "learns that in some material respect the disclosure or response is incomplete or incorrect . . . [.]" Fed. R. Civ. P. 26(e)(1)(A). "'[A] party must disclose all information provided to its testifying expert for consideration in the expert's report[.]'" *In re Benicar (Olmesartan) Prods. Liab. Litig.*, 319 F.R.D. 139, 141 (D.N.J. 2017) (quoting *Synthes Spine Co., L.P. v. Walden*, 232 F.R.D. 460, 463 (E.D. Pa. 2005)). Failure to disclose the information required by Rule 26(a) or Rule 26(e)(1) may result in appropriate sanctions, although the wholesale exclusion of testimony without a sufficient showing of prejudice to the opposing party may constitute an abuse of discretion. *See Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995) (observing that Rule 37 "expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless").

Intervenors now contend that "Conroy failed to disclose that he relied on a unilaterally selected and 'translated' subset of the Raw KPI Source Data, not the data itself." Intervenors' Mot. at 20. Specifically, they argue that Conroy's report failed to disclose that he "based his conclusions on unilaterally selected KPI Data from Spreadsheets" and that his subsequent disclosure at his deposition did not satisfy Rule 26. Intervenors' Reply at 8. Because Conroy purported to rely on the Raw KPI Source Data, Intervenors argue that Plaintiffs were required to produce it to Intervenors. Intervenors' Mot. at 20. The failure to do so allegedly violates Rule 26 and, according to Intervenors, warrants exclusion of Conroy's reports and testimony. *Id.*

Intervenors' Motion fails on multiple grounds. Primarily, although Conroy's report does not expressly mention "spreadsheets," it repeatedly states that he considered and relied on "KPI data provided by Verizon." Conroy Rep. at 38; *see also id.* ¶¶ 33, 37-38 (referencing the KPI data). Given the history of discovery, as set forth in detail above, Intervenors were fully aware that Verizon

had produced the KPI data in spreadsheet form because the underlying data could not be viewed directly from the Nodes. Accordingly, Conroy's reference to the "KPI data provided by Verizon" necessarily referred to those spreadsheets. Conroy then attached to his report, as exhibits, "[a]ll facts or data that [he] considered" in forming his opinions, which included only the spreadsheets and not the "raw data" as requested by Intervenors. Conroy Rep. at 37-38. Intervenors' claimed surprise as to the basis for Conroy's report thus rings hollow.[7]

More importantly, even assuming that Conroy's report was unclear as to whether he relied on the Raw KPI Source Data or on spreadsheets, the Court finds no basis for excluding Conroy's report in its entirety. Under Rule 37(c)(1), the decision to exclude an expert report for failure to comply with Rule 26 is within the discretion of the trial court. *Newman*, 60 F.3d at 156. The Third Circuit has expressed its "aversion, absent extreme circumstances, to the exclusion of crucial evidence." *ABB Air Preheater, Inc. v. Regenerative Envt'l Equip. Co.*, 167 F.R.D. 668, 673 (D.N.J. 1996); *see also In re Paoli RR Yard PCB Litig.*, 35 F.3d 717, 792-93 (3d Cir. 1994) (reversing district court's decision to exclude expert testimony where prejudice was "extremely minimal"). Exclusion of evidence is thus inappropriate unless the failure to disclose or supplement is in bad faith or extreme neglect and the resultant prejudice to the opposing party cannot be cured.[8] *ABB Air Preheater, Inc.*, 167 F.R.D. at 671-72.

---

[7] Intervenors cite *Audubon Engineering Company LLC v. International Procurement and Contracting Group*, 647 F. App'x 95 (3d Cir. 2016), for the proposition that an expert report's failure to disclose the facts or data considered constitutes a "material omission" and "noncompliance" with Rule 26. Intervenors' Reply at 9. In *Audubon Engineering*, however, the court noted, without any elaboration, that "[a]mong its many deficiencies," the expert report failed to set forth the "'facts or data considered by' [the] expert in forming his opinions." *Id.* at 99 (quoting Fed. R. Civ. P. 26(a)(2)(B)(ii)). Because Intervenors have not claimed that Conroy's report is plagued by "many deficiencies," or even any of the same deficiencies, the Court finds *Audubon Engineering* inapposite.

[8] The Third Circuit has set forth factors (the "*Pennypack* factors") to be considered when determining whether "exclusion of evidence is an appropriate sanction for failure to comply with discovery duties[.]" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000) (citing

Intervenors have failed to show any bad faith, prejudice, or disruption to the case. At no point did Conroy or Plaintiffs explicitly represent that Conroy actually relied on the Raw KPI Source Data. Indeed, throughout his September 9, 2025 deposition—conducted two and a half months after issuance of his report—Conroy made clear that he had not reviewed the "raw data" contained in the Nodes but instead relied on four spreadsheets of key performance indicator data provided by Plaintiffs. Conroy Dep. at 65:13-66:4. He testified that the "data was initially recorded at the eNodeB and transmitted up to Verizon's system, and the spreadsheet . . . was created in Verizon's system by export of the selected data." *Id.* at 68:9-14. Conroy repeatedly emphasized his reliance on the spreadsheets and the information contained therein, not the full set of data directly from the Nodes. *See id.* at 82:15-18; 97:8-15. Thus, Intervenors had full knowledge of the facts and bases underlying Conroy's opinions by September 2025 at the latest. And Intervenors have not articulated any discernible prejudice from the brief "uncertainty" between the report's issuance in June 2025 and Conroy's September 9, 2025 deposition that would warrant the extreme sanction of exclusion.

As the record demonstrates, Conroy clearly relied on the spreadsheets to form his opinion and did not consider the "raw data" maintained in the XLPT database. Because Intervenors do not dispute that Plaintiffs produced those spreadsheets to them, the Court finds no violation of Plaintiffs'

---

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (referencing the factors in *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977))). These factors include "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or wilfulness in failing to comply with a court order or discovery obligation." *Id.* (quoting *Konstantopoulos*, 112 F.3d at 719). The Third Circuit has supplemented these factors to also require consideration of the importance of the excluded testimony and the party's explanation for failing to disclose. *Carmichael v. Thomson*, No. 14-3323, 2018 WL 4629516, at *4 (D.N.J. Sept. 27, 2018) (citing *Konstantopoulos*, 112 F.3d at 719). While the Court here does not individually address each *Pennypack* factor, the Court's discussion implicitly considers them.

disclosure obligations under Federal Rule of Civil Procedure 26 and declines to exclude Conroy's reports on this ground.

C. Whether Conroy's Report Is Unreliable, and Thus Excludable, Under Federal Rule of Evidence 703

In a final effort to exclude Conroy's reports, Intervenors rely on Federal Rule of Evidence 703, which provides as follows:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

Intervenors argue that Conroy's reports should be excluded because the spreadsheets upon which they are based constitute inadmissible hearsay evidence and thus lack reliability. Intervenors' Mot. at 22-27. Specifically, they assert that the spreadsheets were created by Plaintiffs' engineers and not by Conroy, thus rendering them hearsay. *Id.* at 23. Moreover, they claim that Conroy provides the Court with no testimony or evidence to demonstrate that the spreadsheets are inherently reliable, and the fact that they were "created exclusively for litigation" undermines their reliability. *Id.* at 24-25. Finally, Intervenors argue that Conroy is unable to establish that the spreadsheets contain the type of data that other experts in the field rely upon. *Id.* at 26. Intervenors conclude that because Conroy cannot meet his Rule 703 obligations, the Court should exclude his reports and testimony. *Id.* at 27.

Plaintiffs' response is twofold. First, they contend that the spreadsheets are admissible under the business records exception to the hearsay rule, set forth in Federal Rule of Evidence 803(6). Second, they assert that, even if the spreadsheets were inadmissible hearsay, Federal Rule of

Evidence 703 permits Conroy to rely on the spreadsheets because such spreadsheets are typically relied upon by expert engineers in this field. Because the Court finds that the spreadsheets are admissible as business records, the Court's analysis focuses solely on that argument.[9]

One condition of the business records hearsay exception requires that "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit[.]" Fed. R. Evid. 803(6)(B). A record "of an act, event, condition, opinion, or diagnosis" qualifies under the exception if

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all of these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

---

[9] Although the Court need not address Plaintiffs' second argument, the Court nonetheless notes that when assessing reasonable reliance, courts will look to what experts in the relevant discipline deem to be reliable facts or data. *In re Paoli*, 35 F.3d at 747. The Court can consider other relevant factors, including "the particular expert's opinion that experts reasonably rely on that type of data, as well as the opinions of other experts as to its reliability." *Id.* at 748.

Here, Conroy attested in his Declaration that he is "very familiar with methodologies and data relied upon by other engineering experts as I have had conversations with such experts and reviewed their expert reports in connection with determining the need for additional wireless facilities in both the zoning and litigation processes, throughout my 38 years' experience." Conroy Decl. ¶ 17. He "confirm[ed] that other engineering experts typically rely upon spreadsheets provided by the carriers, similar to the Spreadsheets, and the specific KPIs analyzed in [his] expert reports in this Action." *Id.* ¶ 18. That statement alone—absent any showing by Intervenors to the contrary—satisfies Plaintiffs' burden of showing that the spreadsheets are of the type reasonably relied upon by experts in forming an opinion on the subject. Intervenors' assertion that Conroy "'should have done more'" by examining the Raw KPI Source Data, Intervenors' Mot. at 25, is an argument that goes to the weight of the expert's reports and testimony rather than their admissibility. *See generally Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) (noting that the testifying expert's knowledge regarding the underlying facts would go to the weight accorded to the expert's testimony and may be explored on cross-examination).

Here, Plaintiffs have sufficiently established that the spreadsheets satisfy the first four elements. Plaintiffs' senior RF engineer Osama Eldsoky testified that the RF data is collected at the time of data usage, that the spreadsheets are then generated from that data in the regular course of business, and that the making of these records is a regular practice of Plaintiffs. *See* Eldsoky Dep. at 19:4-20:18 (testifying that Verizon determines capacity deficiencies by "go[ing] through the KPIs and our data, and I go on and I create Excel sheets and I create documents that show that we have deficiency in the area . . . ."); *id.* at 43:18-24 ("Q. So do you recognize what has been marked as Exhibit A? . . . A. This is our data that we create from a tool called XL[P]T. And this is where we see our KPIs, how the sites are doing."); *id.* at 59:1-60:6 (explaining that the RF data is collected and then transferred by an engineer through the XL[P]T tool, which "creates a chart in Excel"); *id.* at 66:4-13 (stating that an engineer uses XL[P]T to transfer the data into a graph). Declarations from several of Plaintiffs' other engineers state that the spreadsheets at issue are "generated using a tool called XLPT, which houses key performance indicator data ('KPIs') collected directly and without modification from Verizon's existing sites." Elbadawy Decl. ¶ 5; Kelch Decl. ¶ 5; Alagha Decl. ¶ 5. They explain that the spreadsheets are "the only practical and useable means" for accessing, using, viewing, and preserving the data and "are consistent with how Verizon uses and preserves the data in the ordinary course of business." Elbadawy Decl. ¶ 5; Kelch Decl. ¶ 5; Alagha Decl. ¶ 5. "The data contained in the Spreadsheet is the raw data that Verizon collects in the normal course of business," is not "manipulated or translated by any person," and is "consistent with the type of spreadsheet that Verizon uses internally when determining the need for additional sites." Elbadawy Decl. ¶¶ 8, 11, 13; Kelch Decl. ¶¶ 8, 11, 13; Alagha Decl. ¶¶ 8, 11, 12.[10]

---

[10] These engineers have stated that they are "available to testify if this matter proceeds to trial." Elbadawy Decl. ¶ 16; Kelch Decl. ¶ 16; Alagha Decl. ¶ 15.

In light of this evidence, the burden then shifts to Intervenors to prove that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. *See* Fed. R. Evid. 803(6). To that end, Intervenors set forth several arguments.

First, they contend that the spreadsheets were generated at times different from those when the Raw KPI Source Data was collected, which makes them "different records." Intervenors' Reply at 10-11 & n.5. As noted above, however, the data in the spreadsheets is, in fact, the raw data collected in the ordinary course of business; the spreadsheets are the only "practical and useable" means for viewing that data. Elbadawy Decl. ¶ 5; Kelch Decl. ¶ 5; Alagha Decl. ¶ 5. The spreadsheets are simply the same business records in a different medium. *See United States v. Battles*, 514 F. App'x 242, 249 (3d Cir. 2013) (holding that a spreadsheet used at trial depicting a small portion of an "interactive voice response" (IVR) database, which reflected transactions made in the bank's IVR system, was admissible under the business records exception to the hearsay rule); *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018) (rejecting argument that transferring records into spreadsheets for purposes of litigation eliminates the business records exception and holding that business records in one form, such as a database, may be presented at trial in another form, such as a spreadsheet); *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business." (emphasis omitted)).

Second, Intervenors contend that the spreadsheets lack trustworthiness because "they were created in anticipation of litigation and the KPIs contained therein were unilaterally selected by Verizon." Intervenors' Reply at 12. Intervenors argue that because the spreadsheets were created only after Defendants requested the data and conferred with Plaintiffs' counsel about its production, "[t]he sole purpose of the Spreadsheets is to be used in the litigation as evidence." *Id.* at 13.

Intervenors assert that "[r]ecords 'calculated for use essentially in the court, not in the business[,]' have been found not to qualify as business records." *Id.* at 14 (quoting *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943)).

Intervenors' argument is misplaced. No evidentiary rule renders a business record inadmissible merely because it was generated after litigation began. *See United States v. Casoni*, 950 F.2d 893, 911 n.10 (3d Cir. 1991). "[T]he critical issue is how much weight the [c]ourt should give this evidence." *Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, No. 20-18140, 2021 WL 4145062, at *23 (D.N.J. Aug. 4, 2021). While records created *specifically* for the purpose of pending litigation may have indicia of untrustworthiness, *see Palmer*, 318 U.S. at 114, "the mere existence of pending litigation or an alternative motive does not require a blanket ban on legitimate business records." *United States v. Onyenso*, No. 12-602, 2013 WL 5322686, at *2 (D.N.J. Sept. 20, 2013) (citing *Casoni*, 950 F.2d at 911 n.10 (noting that although trustworthiness is a factor that must be considered in determining the admissibility of business records, there is no requirement in Rule 803(6) that the records be created before a possible motive to falsify arises)). A business record otherwise kept regularly does not lose its admissibility simply because it was requested by an opposing party for use in litigation. *Onyenso*, 2013 WL 5322686, at *2. Likewise, where the records are kept regularly in the ordinary course of business, and then the *medium* of the records is changed for production in litigation, the records retain their status as business records. *Id.; United States v. Browne*, 602 F. Supp. 3d 687, 694-95 (D.N.J. 2022) ("'[A] computer printout that merely reproduces a selected subset of data from underlying, electronically stored business records . . . could qualify as a business record, even though it was created expressly for use in the prosecution of [a defendant].'" (quoting *United States v. Ekiyor*, 90 F. Supp. 3d 735, 742 (E.D. Mich. 2015))).

Here, the Raw KPI Source Data is created at the time of usage, spreadsheets are then generated from that data in the regular course of business, and the making of these records is a

regular practice of Plaintiffs. Eldsoky Dep. at 19:4-20:18; 43:18-24; 59:1-60:6; 66:4-13. To the extent that the specific spreadsheets at issue were generated after litigation commenced, Intervenors have made no showing that the underlying data was created for purposes of litigation. Rather, the record establishes that Plaintiffs converted that regularly collected data into a new medium (i.e., spreadsheets) to provide it in a form usable and viewable by opposing counsel. Elbadawy Decl. ¶¶ 8, 11, 13; Kelch Decl. ¶¶ 8, 11, 13; Alagha Decl. ¶¶ 8, 11, 12. The mere fact that litigation had begun when the spreadsheets were generated does not establish that the spreadsheets or the raw data reflected therein have any indicia of untrustworthiness.

Finally, Intervenors argue that "[d]espite four certifications from potential Verizon witnesses, Verizon is unable to provide any testimony that would support the conclusion that the data extracted from the Nodes and then exported to Spreadsheets was in fact ***all of the exact same data that was originally recorded at the Nodes.***" Intervenors' Reply at 12 (emphasis in original). Intervenors further argue that the spreadsheets reflect "a curated and translated version of the Raw Source KPI Data, generated by Verizon to portray the picture and KPIs it wishes to present." *Id.* at 13.[11]

[11] Intervenors cite portions of Conroy's deposition as substantiating the point that the spreadsheets are translated and curated versions of the raw data. *See* Intervenors' Reply at 13. The cited testimony, however, does not substantiate the Intervenors' argument that the raw data was changed in any way. In fact, Conroy testified that the spreadsheets reflect the raw data. *See* Conroy Dep. at 66:16-67:17 (testifying that the eNodeB gathers information and transmits it to a centralized location in Verizon's network; someone then can go into Verizon's system and pull up data from a specific eNodeB for a desired period using certain parameters to be analyzed, at which point the data is exported into a spreadsheet); *id.* at 82:15-83:3 (noting that certain charts and graphs were created from the information on the spreadsheets); *id.* at 85:7-25 (explaining that the KPI data is stored in a system that Verizon uses called XLPT, or experience level performance tool); *id.* at 91:8-92:3 (noting that the numbers on the spreadsheets "come[] from the eNodeB. That's raw data from the eNodeB[,]" and the spreadsheet simply reflects the numbers from the software tool used to pull that raw data).

That argument impermissibly attempts to shift the burden of proof to Plaintiffs. As Conroy testified—and as repeatedly explained here—the numbers in the spreadsheets are the raw data from the Node. Conroy Dep. at 91:12-18, 92:19-94:16. The spreadsheets are the precise "information [Verizon] rel[ies] upon to inform performance on their network and make sure it's operating properly. This is raw data." *Id.* at 94:11-16. Plaintiffs' engineers have attested that the data is not manipulated or translated by any person. *See* Elbadawy Decl. ¶¶ 8, 11, 13; Kelch Decl. ¶¶ 8, 11, 13; Alagha Decl. ¶¶ 8, 11, 12. Intervenors' own expert testified that he had no reason to believe the data provided in the spreadsheets was inaccurate, could not be relied upon, or was changed in any way. Beegle Dep. at 38:10-18, 75:14-17. Indeed, Intervenors may challenge the accuracy or completeness of the spreadsheets, or Conroy's exclusive reliance on those provided by Plaintiffs, through cross-examination. Those concerns do not warrant wholesale exclusion of Conroy's expert reports and testimony. *See United States v. Boufarah*, No. 22-4476, 2024 WL 5087824, at *7 (D.N.J. Dec. 12, 2024) ("'[A]ny question as to the *accuracy* of [business records], whether resulting from incorrect data entry or the operation of the computer program, . . . affects only the weight of the [records], not their admissibility.'" (emphasis in original) (quoting *Dicuio v. Brother Int'l Corp.*, No. 11-1447, 2015 WL 3403144, at *12 n.10 (D.N.J. May 27, 2015), *aff'd*, 653 F. App'x 109 (3d Cir. 2016))).

In short, the Court finds that the spreadsheets fall within the business records exception of Federal Rule of Evidence 803(6). The data was collected at or near the time of the activity and kept in the course of a regularly conducted business activity, and its collection was a regular practice. Plaintiffs' proffered witness testimony substantiates each of these elements. Intervenors have not shown that transferring the data from the Nodes to the spreadsheets substantively altered the data or otherwise rendered it untrustworthy. Accordingly, the Court declines to exclude Conroy's reports and testimony on this ground.

## CONCLUSION

For these reasons, the Court finds no basis to exclude Plaintiffs' expert reports and testimony and denies Intervenors' Motion in its entirety. An appropriate Order follows.

s/Elizabeth A. Pascal
ELIZABETH A. PASCAL
United States Magistrate Judge

cc: Edward S. Kiel, U.S.D.J.